NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0085n.06

Case No. 22-1228

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ANGELO THOMPSON, | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| RYOBI LIMITED, et al., | ) | COURT FOR THE EASTERN |
| Defendants, | ) | DISTRICT OF MICHIGAN |
|  | ) | |
| TECHTRONIC INDUSTRIES NORTH | ) | O P I N I O N |
| AMERICAN (TTI); ONE WORLD | ) | |
| TECHNOLOGIES, INCORPORATED, | ) | |
| Defendants-Appellees. | ) | |

FILED
Feb 13, 2023
DEBORAH S. HUNT, Clerk

Before: COLE, NALBANDIAN, and READLER, Circuit Judges.

COLE, Circuit Judge. Angelo Thompson suffered severe burns due to a generator fire on the roof of his residence. To recover damages from the incident, Thompson sued various parties, including the generator manufacturer and seller, under a theory of products liability. The defendants relevant on appeal, Techtronic Industries North American ("Techtronic") and One World Technologies, Inc. ("One World"), moved for summary judgment, disclaiming liability due to Thompson's alleged impairment and unforeseeable misuse. The district court granted summary judgment on both grounds. We affirm.

## I.  BACKGROUND

**A.  Facts**

Angelo Thompson resides in an apartment complex that often uses a generator as a source of power when the building owner is unable to pay for electricity.  This case concerns one such generator—a Ryobi gasoline-powered generator designed by One World.  Thompson's landlord purchased the generator for use at Thompson's building on or about September 16, 2016, and it was installed on the roof that same day.  The power went out in Thompson's building on September 25, 2016.  Another tenant, Brook Banham, tried to restart the generator.  Around 9:30 p.m., Banham told Thompson that he was unable to start the Ryobi generator, so Thompson went to help.

Thompson testified that he had read the operator's manual for a prior generator and at least some of the Ryobi generator operator's manual, and that he knew the risks of gasoline.  Thompson was unable to start the generator and decided to check the generator's gas level.  The generator did not have an external gas gauge, so he removed the gas cap, tilted the generator using the upright handle, and shined his flashlight inside.  After seeing there was gas in the generator, there was an "explosion," and Thompson's pant legs caught on fire—the gas "was all over [him], and [he] was all on fire."  (Pl.'s Dep., R. 60, Ex. 2, PageID 961–62, 966–67.)

Banham and his wife came to the roof to help after hearing Thompson's screams, where they then saw Thompson "on the ground, kind of rolling around, trying to pat the flames on his legs and shoes."  (Brook Banham Dep., R. 73, Ex. 4, PageID 2416.)  Banham used a fire extinguisher to put out the remaining flames.  Thompson refused Banham's offer to call an ambulance, but Banham later drove him to the hospital.

The explosion resulted in second and third degree burns to Thompson's lower legs, covering 18 or 19% of his body. Thompson underwent multiple skin-graft surgeries and has ongoing physical and emotional pain and difficulties resulting from the incident. At the hospital, tests from 1:56 a.m.—approximately four hours after the fire—revealed Thompson had a blood alcohol concentration ("BAC") of 0.046 and his urine drug screen was positive for cannabinoids, cocaine metabolite, and opiates.

The defendants' medical toxicologist expert, Dr. Kirk Charles Mills, interpreted Thompson's blood and urine samples from the hospital. Specifically, Dr. Mills applied a scientific technique called "retrograde extrapolation" to estimate Thompson's earlier BAC based on his later BAC, factoring in the average male population's alcohol metabolization rate. (Mills Rep., R. 60, Ex. 7, PageID 1020–21.) He calculated that "Thompson's extrapolated BAC at the time of the accident was most likely between 0.086 and 0.126, with an average BAC of 0.106 at [the time of the accident.]" Dr. Mills concluded that a BAC in his estimated range is "more than sufficient to cause alcohol impairment" and that "more likely than not, Mr. Thompson's alcohol impairment was a major contributor to the accident," which occurred as a result of Thompson "remov[ing] the generator gas cap, tilt[ing] the generator forward, spilling gasoline on himself and the generator, [and] causing ignition of the gasoline[.]" He stated that Thompson's injuries from this ignition were "entirely preventable" had he not operated the generator while under the influence of alcohol. Dr. Mills noted that Thompson understood the operator's manual's warning to "not operate generator when you are . . . under the influence of drugs, alcohol, or medication" to mean "that if you are [sic] impaired in any way [sic] you could make a deadly mistake."

Dr. Mills also discussed Thompson's drug screen, which was positive for cannabinoids, cocaine metabolite, and opiates. While Thompson did not appear to be impaired by drugs at the

hospital, Dr. Mills noted that the time delay between the accident and his evaluation was long enough for him to not show signs of drug impairment even if he had consumed such substances. But positive urine tests for such substances may indicate use prior to the day of the incident, and the positive opioids result could have been from an IV at the hospital. So, Dr. Mills ultimately based his conclusion on Thompson's impairment due to alcohol, not drugs.

As to the generator itself, the defendants submitted an evaluation by a mechanical engineer and certified fire and explosion investigator, Dennis Scardino. Scardino concluded that Thompson introduced the ignition source, that Thompson's conduct caused the gas spill and the fire, and that, ultimately, the generator's design "was not defective and was not a cause of this fire." (Scardino Rep., R. 60, Ex. 9, PageID 1076.) As to his conclusion about the generator not being defective, Scardino reported that the "fuel [level indicator] cap feature is not necessary for the safe operation of a generator" and that "deliberate removal of the generator's fuel fill cap with the subsequent deliberate movement (e.g., tilting . . . ) of the generator would not be a reasonable action[.]" Scardino also noted Thompson's knowledge of the hazards of gasoline and his review of the generator's operator's manual and the "on-product decals and instructions" prior to the incident, which Scardino said were "adequate and sufficient for the safe operation of the generator."

In addition, the defendants submitted an affidavit from David Anderson, a product safety engineer at Techtronic who is familiar with or has personal knowledge of the design, use, operation, and associated standards of the generator at issue. (Anderson Aff., R. 60, Ex. 4, PageID 972.) Anderson testified that Thompson's conduct constituted a misuse of the generator, and that such misuse is unforeseeable. As to the tipping, Thompson alleged the generator was defective by having an upright "hand truck" style handle and by not having an external gas gauge or forward stabilizing legs. (Compl., R. 1, PageID 22–25.) Anderson claimed the manufacturer has "no

record of any claim or suit of injury that the Ryobi generator . . . was somehow defective" in the ways Thompson alleged. He further stated that operating the generator the way Thompson did—knowing the hazards of gasoline, as described in the generator's manual—is "inconsistent with actions of a reasonably prudent consumer." As to intoxication, he pointed to the manual's "explicit warning . . . about not attempting to operate the generator when under the influence of alcohol" as evidence that doing so, especially knowing the risks, would be an unforeseeable misuse.

## B. Procedural History

Thompson filed a product liability suit alleging (1) negligent design and (2) breach of implied warranties of fitness for a particular purpose and merchantability. The suit was originally filed in state court against Ryobi Limited, Ryobi Tools, Techtronic, One World, and Home Depot. Some of the original defendants removed the lawsuit to federal court based on diversity jurisdiction. Ryobi Limited, Ryobi Tools, and Home Depot were dismissed at various points during the litigation, so the relevant defendants here are Techtronic and One World ("defendants")—Techtronic only as the parent company of One World, who designed the generator at issue.

Discovery commenced, and the defendants sought to preclude Thompson from calling four proposed experts as witnesses, as well as from calling any treating physician for their testimony. A magistrate judge granted the motion to exclude as to two experts and denied as to two experts, and limited what Thompson's treating physicians could testify about. The defendants timely objected. The defendants simultaneously sought summary judgment on five grounds, including two relevant on appeal: impairment and unforeseeable misuse.

The district court granted summary judgment on both grounds, finding that Thompson failed to present arguments or evidence sufficient to create a genuine issue of material fact. district

court also denied the defendants' motion to strike Thompson's multiple briefs in response to the defendants' motion for summary judgment—two of which were untimely—and denied the defendants' objections to the magistrate judge's order as moot.

On appeal, Thompson challenges both grounds of the district court's grant of summary judgment in favor of the defendants.

## II. ANALYSIS

### A. Legal Standard

We review the district court's grant of summary judgment de novo, viewing all the evidence and inferences in the light most favorable to the nonmoving party. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

Rule 56 requires summary judgment against a party who fails to establish the existence of an element essential to their case on which they would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment employs a burden shifting framework: if the moving party meets their burden of "demonstrating the absence of a genuine issue of material fact," "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10, 587 (1986) (quoting Fed. R. Civ. P. 56(e) (amended 2010)). To satisfy this burden, the nonmoving party must present a sufficient amount of evidence such that a reasonable juror could find for them, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and must direct the court to specific facts in the materials in the record to support their argument, Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324.

**B. Analysis**

*1. Misuse*

"A manufacturer or seller is not liable in a product liability action for harm *caused by misuse* of a product unless the misuse was *reasonably foreseeable*." Mich. Comp. Laws § 600.2947(2) (emphasis added). So, to avoid liability on misuse grounds, we must resolve two legal questions in favor of the defendants: (1) that there was a misuse of the product, and (2) that such use was not reasonably foreseeable. *See id.*

"Misuse" has been statutorily defined by the Michigan legislature as "use of a product in a materially different manner than the product's intended use," including "uses contrary to a warning or instruction . . . and uses other than those for which the product would be considered suitable by a reasonably prudent person in the same or similar circumstances." Mich. Comp. Laws § 600.2945(e). Though "reasonably foreseeable" has not been as clearly defined, according to the Michigan Supreme Court, "the crucial inquiry is whether, at the time the product was manufactured, the manufacturer was aware, or should have been aware, of that misuse," which includes "whether that misuse was a common practice, or if foreseeability was inherent in the product." *Iliades v. Dieffenbacher N. Am. Inc.*, 915 N.W.2d 338, 344 (Mich. 2018).

As a threshold matter, we define the "misuse" at issue. The district court agreed with the defendants that Thompson misused the generator by tipping the generator while the cap was off and by operating it while impaired. On appeal, Thompson "does not challenge a finding of 'misuse' under [the statute's] broad definition," (Appellant Br. 18 n.6), so we accept the district court's characterization and proceed assuming Thompson misused the generator in both of these ways.

Regardless of whether the defendants assert unforeseeable misuse as a statutory defense or whether Thompson must prove his misuse was reasonable as part of his prima facie case, the impact is the same: the underlying product liability action can only move forward to the extent that the defendants can be held liable, which turns here on whether Thompson unforeseeably misused the generator.

Thompson is correct that "if 'misuse' is 'foreseeable' the case may move forward." (Appellant Br. 18 n.6.) But at the summary judgment stage, if the moving party presents evidence in their favor—here, that the misuses were unforeseeable—the nonmoving party must then present evidence to rebut the moving party's assertions—here, that the misuses were foreseeable. As discussed above, the defendants submitted a report from a fire and explosion investigator and an affidavit from a Techtronic product safety engineer. Both the report and affidavit support a finding that Thompson's misuses of the generator were not reasonably foreseeable. Both Scardino and Anderson concluded that Thompson misused the generator and discussed Thompson's knowledge of the relevant safety guidelines, such as the hazards of gasoline and warnings not to operate the generator under the influence. Scardino focused on the safety of the generator as designed, and opined that the misuse by tilting was not "inherent" in the product because it was "not . . . a reasonable action as it would be expected to result in gasoline spillage[.]" Anderson attested that Thompson's tilting and use of the generator while under the influence are unintended uses, and that the defendants were unaware of any uses of the generator in this way. In their motion for summary judgment, the defendants engaged with the report and affidavit, and directed the court to this evidence in the record to support that both misuses were unforeseeable.

In response below, Thompson put forth no argument to counter the defendants' arguments that neither misuse is foreseeable. Thompson's response focused only on establishing the elements

of his underlying products liability claim for negligent design, and specifically on proving an alternative design. But as discussed, in order to succeed on his products liability claim, Thompson must be able to hold the defendants liable. Even if Thompson properly alleged the other elements of his products liability claim, if the defendants can prove they are not liable due to Thompson's actions, the case does not move forward. At the summary judgment stage, Thompson must proffer enough evidence that a jury could reasonably find that either misuse was foreseeable. Thompson failed to do so in his response, and we limit our review to that document on appeal. *See Rutland v. R & R Trailers Inc.*, No. 21-1181, 2021 WL 4847704, at \*2 (6th Cir. 2021) (addressing a forfeited misuse argument).

Ultimately, because Thompson, as the nonmoving party, did not "come forward with some probative evidence" that his misuse was foreseeable such that it would be "necessary to resolve the differences at trial," summary judgment is appropriate. *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991).

### 2. Impairment

To win on Michigan's impairment affirmative defense at the summary judgment stage, the defendants must show that Thompson was "impaired," as defined in the statute, and that because of this impairment, Thompson was 50% or more the cause of the accident or event that resulted in his injury. Mich. Comp. Laws § 600.2955a(1); *Harbour v. Corr. Med. Servs., Inc.*, 702 N.W.2d 671, 674 (Mich. Ct. App. 2005). If an individual is considered "impaired" as it relates to vehicle operation, that individual is presumed to be "impaired" in the personal injury context. Mich. Comp. Laws § 600.2955a(2)(b). Per Michigan law, an individual is too impaired to operate a

vehicle if their blood alcohol concentration (BAC) is 0.08 or above.[1]   Mich. Comp. Laws § 257.625(1)(b).  So, an individual with a BAC of 0.08 or above is presumed to be impaired in the personal injury context.  If the defendant demonstrates that such a presumption applies, and that the individual's impairment was 50% or more the cause of the accident, the burden then shifts to the plaintiff to prove a genuine dispute of fact on either element.  *See Campbell*, 238 F.3d at 775.

As to impairment, the defendants proffered its expert toxicologist's opinion that, based on Thompson's hospital toxicology records approximately four hours after the incident, Thompson's BAC would have been between 0.086 and 0.126, with an average of 0.106, at the time of the incident.  Mills' report puts Thompson's BAC over the legal driving limit, which entitles the defendants to a presumption that Thompson was impaired at the time of the incident.  *See* Mich. Comp. Laws § 600.2955a(2)(b).  In response, Thompson asserted that his decisions to roll himself or jump to the ground from the roof and call out for help upon landing were conscious, life-saving choices.  This "alertness and presence of mind," he claimed, "exemplifies contrary indications that any consumption of alcohol adversely affected [his] alertness and analytical ability[.]" (Pl.'s Resp. to Defs.' Mot. Summ. J., R. 72, PageID 2317.)  But he does not present any evidence—only argument—that this was his state of mind at the time of the incident.  *See Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence.").  So, the defendants carried their burden on the first prong of the impairment defense.

As to causation, finding that this BAC is "more than sufficient to cause alcohol impairment," Mills opined that such impairment was "more likely than not . . . a major contributor to the accident" when considering Thompson's knowledge of both the risk of operating the

---

[1] Michigan increased the impairment presumption BAC to 0.10 in 2021 but, as the conduct occurred in 2016, we agree with the district court that the 0.08 BAC level should control.  *See* Op. and Order, R. 87, PageID 3032 n.4 (interpreting Mich. Comp. Laws § 257.625(1)(b)).

generator while impaired and the flammable nature of the gas. Mills concluded the injury was "entirely preventable" had Thompson not used the generator while impaired, and that doing so is "consistent with risk-taking behavior due to poor judgment caused by alcohol impairment." On this evidence alone, the district court determined there was no dispute of fact on causation—a conclusion required to grant summary judgment on this ground.

While we agree with the district court that Thompson ultimately failed to present evidence to rebut the presumption that he was impaired, we withhold judgment on the second element of the impairment defense. As we grant summary judgment to the defendants regardless, we need not definitively determine whether the defendants' evidence constitutes unrebutted evidence that, because of his impairment, Thompson was 50% or more the cause of the accident.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's opinion and order.